IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

NAVIGATORS SPECIALTY
INSURANCE CO.,

    *Plaintiff*,

    v.

MEDICAL BENEFITS
ADMINISTRATORS OF MD, INC.,
*et al.*

    *Defendants*.

Civil Action No. ELH-12-2076

## MEMORANDUM OPINION

This case involves an insurance coverage dispute between plaintiff Navigators Specialty

Insurance Co. ("Navigators") and defendants Medical Benefits Administrators of MD, Inc.

("MBA") and R.J. Wilson & Associates, Ltd. ("RJW"). The dispute arises from two successive

Error and Omissions insurance policies (the "2009-2010 Policy" and the "2010-2011 Policy")

issued by Navigators to MBA, each of which contained an endorsement naming RJW as an

additional insured.

In sum, Navigators filed suit in this Court (ECF 1) seeking a declaration that it is not

required to provide coverage to defendants under the 2010-2011 Policy with respect to a lawsuit

pending in this district against defendants, *Certain Underwriters at Lloyd's London v. R.J.*

*Wilson and Associates, Ltd. and Medical Benefits Administrators of Md. Inc.*, Civ. No. CBB-11-

01809, filed on June 30, 2011 (the "Maryland Action").[1] That suit involves claims for breach of

---

[1] This Court has diversity jurisdiction, as plaintiff is a New York corporation with its
principal place of business in New York, defendants are Maryland corporations with their
principal places of business in Maryland, and the amount in controversy exceeds $75,000. *See*
28 U.S.C. §1332(a).

contract, breach of fiduciary duty, and fraud and seeks more than one million dollars in damages. Navigators contends, *inter alia*, that the insured did not timely make and report the claim to Navigators. According to Navigators, the claim was reported during the 2010-2011 policy period, but it was first made against the defendants as early as 2008 and, at the latest, by July 26, 2010. Therefore, Navigators maintains that no coverage is available under the 2010-2011 Policy. ECF 47-1 at 10, 12. Navigators, which has been defending MBA and RJW in the Maryland Action subject to a reservation of rights and defenses, also claims that it is entitled to reimbursement for the expenses it has incurred in defending MBA and RJW in the Maryland Action.[2]

Defendants filed a counterclaim (ECF 22) seeking a declaration that coverage for the Maryland Action exists under the 2010-2011 Policy or, alternatively, that coverage exists under the 2009-2010 Policy. As to the 2010-2011 Policy, they maintain that the claim was first made against them and reported to Navigators within the policy period. Alternatively, they argue that if the claim was first made against them before the 2010-2011 policy period, then the claim is covered under the 2009-2010 Policy. They acknowledge that they did not timely report the claim to Navigators within the 2009-2010 policy period, but contend that Navigators was not prejudiced by late notice.

The parties have filed cross-motions for summary judgment. Navigators filed a Motion for Summary Judgment ("Navigators Motion," ECF 47), supported by a memorandum of law

---

[2] Although the Complaint states that Navigators seeks a "declaration that it has no obligation to continue defending MBA and RJW," Compl. ¶ 2, Navigators has since abandoned its argument regarding its duty to defend MBA and RJW. *See* Navigators Reply at 21 ("Navigators did not argue that there is no duty to defend . . . . Indeed, . . . Navigators is currently providing a defense to both [defendants] in the Maryland Action."); *see also* Def. Reply at 14 ("Navigators concedes that the allegations of the Maryland Action trigger a duty to defend RJW and MBA.").

("Memo," ECF 47-1) and several exhibits. Defendants filed a consolidated Opposition and Cross-Motion for Summary Judgment (ECF 48), also supported by a memorandum of law ("Opp.," ECF 48-1) and several exhibits.[3] The central issue is whether Navigators is required by either policy to provide coverage to MBA and RJW with respect to the Maryland Action.

No hearing is necessary to resolve the motions. *See* Local Rule 105.6. For the reasons set forth below, I will grant plaintiff's motion with regard to the 2010-2011 Policy, and will deny it with regard the 2009-2010 Policy. And, I will deny defendants' cross-motion.

## Factual Summary

### *The Navigators Policies*

This case involves two successive claims-made-and-reported insurance policies issued by Navigators to MBA.[4] The first policy, number NY09MPL669102NC, was issued for the period October 31, 2009 to October 31, 2010 ("2009-2010 Policy," Ex. P to Park Dec., ECF 47-19).[5]

---

[3] In addition, Navigators filed a consolidated response in opposition to defendants' cross motion for summary judgment and a reply in support of its own motion for summary judgment ("Navigators Reply," ECF 51). Defendants also filed a reply ("Def. Reply," ECF 53).

[4] A claims-made-and-reported policy requires, as a prerequisite to coverage, that a claim be made against the insured *and* reported to the insurer within the effective dates of the policy. *Rouse Co. v. Fed. Ins. Co.*, 991 F. Supp. 460, 465 (D. Md. 1998). By contrast, a "claims-made" policy requires only that a claim be made against the insured during the policy period, and then reported "promptly" or "as soon as is practicable." *Id.*; *see Sherwood Brands, Inc. v. Great Am. Ins. Co.*, 418 Md. 300, 323, 13 A.3d 1268, 1282 (2011). A third type of policy, known as an "occurrence" policy, covers liability-inducing events "occurring during the policy term, irrespective of when an actual claim is presented." *St. Paul Fire & Marine Ins. Co. v. House*, 315 Md. 328, 332, 554 A.2d 404, 406 (1989).

In at least one place in their Opposition, defendants refer to the policies as "claims-made" policies rather than as "claims-made-and-reported" policies. *See, e.g.*, Opp. at 4. However, the content of the Defendants' Opposition and Defendants' Reply make clear that defendants agree with plaintiffs that the policies are of the claims-made-and-reported variety.

[5] Most of Navigators' exhibits in support of its Motion are attached to the Declaration of Jung H. Park, counsel for plaintiff ("Park Dec.," ECF 47-3). Defendants have objected to portions of the Park Declaration because "it is not based on personal knowledge and should be

The second policy, number NY10MPL669102IC, was issued for the period October 31, 2010 to October 31, 2011 ("2010-2011 Policy," Ex. Q to Park Dec., ECF 47-20).

Section I.A. of each policy provides, *e.g.*, 2009-2010 Policy (defined terms bolded in original):

> [Navigators] will pay on behalf of the **Insured** all sums in excess of the deductible [$25,000] that the **Insured** becomes legally obligated to pay as **damages** and **claim expenses** as a result of a **claim** first made against the **Insured** and reported in writing to [Navigators] during the **policy period** . . . by reason of an act or omission . . . in the performance of **professional services** by the **Insured** or by someone for whom the **Insured** is legally responsible, provided that:
>
> 1. Such act or omission was committed on or subsequent to the **retroactive date** specified in Item 8 in the Declarations; and
>
> 2. Prior to the inception date of this policy and if continuously renewed, no **Insured** had a basis to believe that any such act or omission, or related act or omission, might reasonably be expected to be the basis of a **claim**.

In the 2009-2010 Policy, the term "claim" is defined as "a demand for money or services naming the **Insured** arising out of an act or omission in the performance of **professional services**. A **claim** also includes the service of suit or the institution of an arbitration proceeding against the **Insured**." 2009-2010 Policy at 5 (defined terms bolded in original). In the 2010-2011 Policy, the term "claim" is defined as follows: "A demand received by an **Insured** for money or services, the service of suit against an **Insured**, or the institution of arbitration against an **Insured**." 2010-2011 Policy at 19 (defined terms bolded in original).

Both policies also contain an Additional Insured Endorsement. It provides: "In consideration of the premium charged, it is understood and agreed that the persons or entities

---

stricken from the record." Opp. at 5. Navigators appears to concede that portions of the Park Declaration are not based on Ms. Park's personal knowledge. Navigators Reply at 24–25. Accordingly, I will not rely on the paragraphs of the Declaration to which defendants object. However, defendants have not objected to the exhibits attached to the Park Declaration.

named below shall be added as additional Insureds under this policy, but only as respects their liability for an Insured's acts or omissions." Ex. P to Park Dec., Endorsement ("Endt.") 2; Ex. Q to Park Dec., Endt. 1.

On or about October 19, 2010, MBA's representative signed an Errors and Omissions Insurance Renewal Application ("2010 Application"). Ex. R. to Park Dec. The 2010 Application provided, in part, *id.*:

> The Applicant's Failure to report to the Company any Claim made against it during the current policy term, or act, or omission or circumstances which the Applicant is aware of which may give rise to a Claim before the expiration of the current policy may create a lack of coverage for each Applicant who had a basis to believe that any such act, error, omission, or circumstance might reasonably be expected to be the basis of a claim.

Similarly, Section I of the 2010-2011 Policy, entitled "Insuring Agreements," provided that coverage was only available if if "[p]rior to the inception date of [the 2010-2011] policy and if continuously renewed no **Insured** had a basis to believe that any such act or omission, or related act or omission, might reasonably be expected to be the basis of a **claim**." (Ex. Q to Park Dec., Endt. 4).

*The Maryland Action*

In late 2004 or early 2005, RJW entered into a Coverholder Agreement, referred to as the "Client First Binding Authority Agreement," with Brit Insurance ("Brit"),[6] an underwriter at Lloyd's of London (collectively, "Lloyd's"). Declaration of Ronald J. Wilson, CEO of RJW and MBA ("Wilson Dec.," ECF 48-4) ¶ 3. The Coverholder Agreement authorized RJA to act on behalf of Lloyd's to bind and administer Certificates of Insurance ("Certificates"), providing

---

[6] In the record, Brit Insurance is also referred to as "Brit Global Markets."

aggregate and specific excess-loss coverage to employer self-funded benefit plans. *Id.* ¶ 4.[7] This program was referred to as the "Client First Program." *Id.* The Coverholder Agreement provided that MBA would act as claims administrator for the Certificates. *Id.*

All Certificates issued under the Client First Program included a Monthly Aggregate Accommodation Agreement ("MAA"). *Id.* ¶ 5. The MAA required the insurer to provide advances on a cumulative monthly basis to the insured if the insured was on pace to meet its annual deductible. *Id.* For example, if after five months of the contract, the insured filed claims for greater than five-twelfths of its annual deductible, the insurer would provide advances to the insured. *Id.* At the end of the contract year, the insured was required to reimburse Lloyd's for the amount of advances it received in excess of what was required under the final annual aggregate. *Id.*

RJW and Lloyd's agreed that MBA would act as RJW's Claims Administrator in regard to the Certificates of Insurance issued under the Client First Binding Authority Agreement. Wilson Dec. ¶ 4. Pursuant to that agreement, RJW submitted reports, called bordereaux, to the Lloyd's broker detailing premiums, claims, advances received and paid to the individual employer welfare plans, and other pertinent accounting information on a monthly basis. *Id.* ¶ 9. MBA, as RJW's Claims Administrator, processed all the claims and accumulated and prepared all of the information for the reports. *Id.* ¶ 10. The Lloyd's broker reviewed the bordereaux and balanced the accounts with Lloyd's at the Exchange Office each month. *Id.* ¶ 11.

---

[7] According to defendants, the product provides protection against unpredictable losses, and is purchased by employers who do not want to assume 100% of the risk of loss in regard to self-funded employee benefit plans. The insurer is liable for losses that exceed certain deductibles. ECF 48-1 at 2 n.2.

On May 10, 2007, Lloyd's terminated the Client First Program. *Id.* ¶ 6. The Certificates issued under the Program expired one year from the date that notice of termination was provided to the insureds. *Id.* At the end of the period of insurance and settlement of all claims, Lloyd's had the right to review and audit RJW's records to make a final accounting and determine if either Lloyd's or RJW was owed money. *Id.* ¶ 7. Lloyd's conducted an initial review and came to the conclusion that over one million dollars in accommodation advances had never been repaid to Lloyd's. *See* Complaint in Maryland Action, ECF 1-1 ¶ 30. In 2008, Lloyd's asked Northshore International Insurance Services, Inc. ("NIIS") to audit the pertinent documents and identify the accommodation advances that were not repaid in accordance with the MAA. Wilson Dec. ¶ 12. In June of 2009, NIIS concluded that $1,032,371.69 in advancements had not been repaid or otherwise reconciled. *See id.* ¶ 15.

On multiple occasions, Lloyd's and/or its agents corresponded with MBA and/or RJW about the discrepancy. Notably, in June 2009, David Ives, CEO of NIIS, stated in an email to Ronald Wilson that "there remains more than $1 million in aggregate advances that have not been supported or reconciled by our office. Until that occurs, those funds are credits due [Lloyd's]." *See* Ex. H to Park Dec. at 10 ("June 2009 Email").[8] On June 24, 2009, Ives sent a letter to Ronald Wilson in which he indicated that "the amount of $1,032,271.69 in advancements have not been repaid or otherwise reconciled to claim expenses." *Id.* at 13 ("June 2009 Letter"). The letter continued, *id.*: "[I]f additional claims have been received that may be

---

[8] A copy of the email itself is not in the record. However, the record contains a letter written by Ronald Wilson in response to the email, which quotes the language of the email. Moreover, the parties do not dispute that the letter accurately portrays the content of the June 2009 email from Ives to Ronald Wilson.

subject to Lloyd's Certificates, please provide the details and supporting documentation. We await the product of your reconciliation, as well."

On January 29, 2010, Matthew Wilson, the CEO of Brit, wrote to Ronald Wilson.[9] In his letter, he stated, Ex. I to Park Dec., ECF 47-12 ("January 2010 Letter") (emphasis added):

> Information developed over the past eighteen months clearly indicates that R.J. Wilson & Associates has failed to repay a portion of amounts paid by Certain Underwriters at Lloyd's which have been determined to be paid outside Agreement Numbers L4717 and WTB-OOlG-06W.

> Specifically, you or your agents have failed to properly maintain records and account for Aggregate Accommodations amounts, which results in non-credited Aggregate Accommodation amounts outstanding and due of $3,178.65 in respect to the 2005 Treaty Year and $1,032,271.69 in respect to the 2006 Treaty year.

> . . .

> As a result of errors and omissions by R.J. Wilson & Associates, *a demand is hereby made* for the $1,113,811.66 in Specific and Aggregate amounts paid which have been determined to be paid outside Agreement Numbers L4717 and WTB-001G-06W.

> *If you have Professional Liability coverage that would respond to these claims, we strongly urge you to notify your insurer immediately*. Perhaps we can resolve this claim without the necessity of litigation which we are fully prepared to commence. Your actions and inactions have left us no other alternative.

By letter to RJW dated May 3, 2010, Brit referenced its prior "demand for repayment of $1,113,811.66 in claim funds due [Lloyd's]" and rejected a proposal RJW had previously made (ECF 47-13) to resolve their differences through the use of independent auditing firms. Ex. K to Park Dec., ECF 47-14 ("May 2010 Letter"). By letter of July 26, 2010, Ian Ritchie, a Senior Claims Adjuster at Brit, wrote to Brit's broker, Gavin Richards,[10] and stated: "If Mr. Wilson

---

[9] The letter is actually dated "January 29, 2009," but the parties agree that it was misdated. *See* Opp. at 10 n.10.

[10] Mr. Richards is "Director of Grosvenor Accident & Health." ECF 47-16.

cannot provide the above information, [Lloyd's] will have no recourse but to proceed with litigation to collect the funds owed to [Lloyd's]." Ex. M to Park Dec., ECF 47-16 ("July 2010 Letter"). According to plaintiff, the letter was forwarded to Ronald Wilson. Park Dec. ¶ 43.[11]

On June 30, 2011, Lloyd's filed suit in this Court against MBA and RJW, captioned *Certain Underwriters at Lloyd's London v. R.J. Wilson and Associates, Ltd. and Medical Benefits Administrators of Md. Inc.*, Civ. No. CBB-11-01809. On or about July 25, 2011, MBA and RJW notified Navigators about the suit. *See* RJW Response to Request for Admission, Ex. O to Park Dec. (ECF 47-18) at 2. As noted, Navigators has provided both RJW and MBA with defense counsel in the Maryland Action, subject to Navigators' reservation of rights and defenses. Declaration of Samuel Marcus, Senior Claims Counsel for Navigators ("Marcus Dec.," ECF 47-2) ¶ 2.

## Standard of Review

Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. It provides, in part: "The court shall grant summary judgment if the movant shows that there is no

---

[11] Navigators also contends that a claim was made in 2008 when Brit "advised Ronald Wilson to notify his errors and omissions and fidelity carriers of the accounting dispute concerning the aggregate accommodations." Memo at 10. In support of its contention that Brit so advised Ronald Wilson, Navigators only proffers a letter sent in June 2011 from counsel for Lloyd's to counsel for defendants, which requests "[c]onfirmation that Wilson placed his errors and omissions and fidelity carriers on notice of this dispute, *as Brit requested in 2008*." June 2011 Letter, Ex. G to Park Dec (ECF 47-10) (emphasis added). As an initial matter, defendants deny that any such request was made in 2008, making it a disputed fact. *See* Wilson Dec. ¶ 20. In any event, Navigators does not provide any further detail about the nature of the 2008 "request," let alone a copy of the request itself. Accordingly, the Court cannot determine whether it satisfied the definition of a "claim."

In addition, Navigators claims that Ronald Wilson admitted at his deposition that Lloyd's requested in 2008 that he place his insurer on notice of the dispute. *See* Navigators Reply at 20; ECF 47-8 at 181–84. However, the testimony Navigators cites, viewed in the light most favorable to defendants, *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), does not contain such an admission. *See* Wilson Dec. ¶ 21.

genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In response to a motion for summary judgment, the non-moving party must demonstrate that there are disputes of material fact so as to preclude the award of summary judgment as a matter of law.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion.  "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson,* 477 U. S. at 247–48 (emphasis in original).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts'" showing that there is a triable issue.  *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004).  In resolving a summary judgment motion, the court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party.  *See Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *see also FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002).  The "judge's function" in reviewing a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Liberty Lobby*, 477 U.S. at 249.  If "the evidence is such that a reasonable jury could

return a verdict for the nonmoving party," there is a dispute of material fact that precludes summary judgment. *Id.* at 248.

When, as here, the parties have filed cross-motions for summary judgment, the court must consider "each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" *Rossignol v. Voorhaar,* 316 F.3d 516, 523 (4th Cir.) (citation omitted), *cert. denied,* 540 U.S. 822 (2003). "Both motions must be denied if the court finds that there is a genuine issue of material fact. But if there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court will render judgment." 10A Wright, Miller & Kane, Federal Practice & Procedure § 2720, at 336–37 (3d ed. 1998, 2012 Supp.).

## Discussion

In the federal courts, declaratory judgments are authorized by the federal Declaratory Judgment Act, 28 U.S.C. § 2201(a), which provides (with exceptions not relevant here) that, in "a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration." Because the parties' rights and obligations in this case arise under the policies, resolution of the cross motions for declaratory judgment turns on interpretation of those policies.

### *The 2010-2011 Policy*

The parties have filed cross motions for summary judgment on the question of whether the Maryland Action is covered under the 2010-2011 Policy. As discussed, the 2010-2011 Policy is a "Claims Made and Reported" policy, under which coverage is available only for "claims" that are first made against the insured *and* reported to the insurer within the policy

period of October 31, 2010 to October 31, 2011. *See* 2010-2011 Policy at 1. Navigators concedes that defendants reported the Maryland Action to them within the policy period for the 2010-2011 Policy. Memo at 10. However, Navigators contends that the "claim" that gave rise to the Maryland Action was first made against defendants prior to October 31, 2010, and therefore the policy "has not been triggered and no coverage is available . . . ." *Id.* at 12. Specifically, Navigators maintains that the June 2009 Email, the June 2009 Letter, the January 2010 Letter, the May 2010 Letter, and the July 2010 Letter each constituted "claims" under the policy. In response, defendants argue that no "claim" was made against them until they were named as defendants in the Maryland Action in July 2011, which fell within the policy period. Opp. at 7.

Thus, the dispute in Count I focuses on whether any of the communications between Lloyd's and defendants prior to the institution of the Maryland Action constituted "claims" within the meaning of the 2010-2011 Policy. If so, Navigators maintains that it has no obligation to provide coverage under the 2010-2011 Policy.

Maryland law is well settled that "the interpretation of an insurance policy is governed by the same principles generally applicable to the construction of other contracts."[12]    *Mitchell v.*

---

[12] In exercising diversity jurisdiction, a federal court "must apply the substantive law of the forum state including its choice of law rules." *Colgan Air, Inc. v. Raytheon Aircraft Co.*, 507 F.3d 270, 275 (4th Cir. 2007) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941), and *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 79 (1938)). Maryland is the forum state. When an insurance policy contains no choice of law provision, Maryland applies the doctrine of *lex loci contractus*, under which "'the law of the jurisdiction where the contract was made controls its validity and construction.'" *U.S. Life Ins. Co. v. Wilson*, 198 Md. App. 452, 463, 18 A.3d 110, 116 (2011). Moreover, the "'*locus contractu* of an insurance policy is the state in which the policy is delivered and the premiums are paid.'" *Id.* (citation omitted). In this case, that state is apparently Maryland; MBA's principal place of business office, to which the policies were addressed, is located in Maryland. *See* 2010-2011 Policy; *see also Volt Info. Sci., Inc. v. Bd. of Trustees of Leland Stanford Univ.*, 489 U.S. 468, 474 (1989) ("interpretation of private

*AARP*, 140 Md. App. 102, 116, 779 A.2d 1061, 1069 (2001); *see State Farm Mut. Ins. Co. v. DeHaan*, 393 Md. 163, 193, 900 A.2d 208, 225–26 (2006); *Cole v. State Farm Mut. Ins. Co.*, 359 Md. 298, 305, 753 A.2d 533, 537 (2000); *see also Cornerstone Title & Escrow, Inc. v. Evanston Ins. Co.*, ___ Fed. App'x ___, 2014 WL 631098, at *4 (4th Cir. Feb. 19, 2014). Accordingly, "'ordinary principles of contract interpretation apply.'" *Megonnell v. United Servs. Automobile Ass'n*, 368 Md. 633, 655, 796 A.2d 758, 772 (2002) (citation omitted); *see Dutta v. State Farm Ins. Co.,* 363 Md. 540, 556, 769 A.2d 948, 957 (2001).

"In order to determine the intention of the parties to an insurance contract, the instrument must be construed as a whole and 'the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution' must be examined." *United Services Auto. Ass'n v. Riley*, 393 Md. 55, 79, 899 A.2d 819, 833 (2006) (quoting *Chantel Assocs. v. Mt. Vernon Fire Ins. Co.*, 338 Md. 131, 142, 656 A.2d 779, 784 (1995)). However, the court bears responsibility for ascertaining the scope and limitations of an insurance policy. *See Fister v. Allstate Life Ins. Co.*, 366 Md. 201, 210, 783 A.2d 194, 199 (2001); *Lloyd E. Mitchell, Inc. v. Maryland Casualty Co., Inc.*, 324 Md. 44, 56, 595 A.2d 469, 475 (1991). In "'deciding the issue of coverage under an insurance policy, the primary principle of construction is to apply the terms of the insurance contract itself.'" *Universal Underwriters Ins. Co. v. Lowe*, 135 Md. App. 122, 137, 761 A.2d 997, 1005 (2000) (quoting *Bausch & Lomb, Inc. v. Utica Mut. Ins. Co.*, 330 Md. 758, 779, 625 A.2d 1021 (1993)).

---

contracts is ordinarily a question of state law"); *accord James v. Circuit City Stores, Inc.*, 370 F.3d 417, 421-22 (4th Cir. 2004); *see also French v. Assurance Co. of Am.*, 448 F.3d 693, 700 (4th Cir. 2006) (stating, in diversity declaratory action regarding coverage under insurance policy issued in Maryland, "we apply . . . Maryland's substantive law regarding the interpretation of an insurance policy"). Moreover, all parties have relied upon Maryland case law in their briefing. I will do the same.

The Maryland Court of Appeals has explained that judicial "interpretation of insurance contracts to determine the scope and limitations of the insurance coverage, like any other contract, begins with the language employed by the parties." *MAMSI Life & Health Ins. Co. v. Callaway*, 375 Md. 261, 279, 825 A.2d 995, 1005 (2003). Generally, Maryland courts "analyze the plain language of [an insurance] contract according to the words and phrases in their ordinary and accepted meanings as defined by what a reasonably prudent lay person would understand them to mean." *Universal Underwriters Ins. Co.*, 135 Md. App. at 137, 761 A.2d at 1005; *see Walk v. Hartford Cas. Ins. Co.*, 382 Md. 1, 14-15, 852 A.2d 98, 106 (2004); *Litz v. State Farm*, 346 Md. 217, 224, 695 A.2d 566, 569 (1997). However, if there is evidence that the parties intended to ascribe a special or technical meaning to certain words used in an insurance contract, those words are construed in accordance with that understanding. *Valliere v. Allstate Insurance Co.*, 324 Md. 139, 142, 596 A.2d 636, 638 (1991) ("When a policy defines a term in a manner which differs from the ordinary understanding of that term, the policy definition controls."); *see also Walk*, 382 Md. at 14-15, 852 A.2d at 106; *Dutta*, 363 Md. at 556, 769 A.2d at 957.

If the court deems the provisions of an insurance policy unambiguous, the meaning of the terms is determined by the court as a matter of law. *Cole*, 359 Md. at 305, 753 A.2d at 537; *Wells v. Chevy Chase Bank, F.S.B.*, 363 Md. 232, 250, 768 A.2d 620 (2001); *see Cornerstone Title & Escrow*, 2014 WL 631098, at *4. In that circumstance, "'a court has no alternative but to enforce those terms.'" *Megonnell*, 368 Md. at 655, 796 A.2d at 772 (quoting *Dutta,* 363 Md. at 557, 556 A.2d at 1138). But, if a contractual term is ambiguous, the court may consult "extrinsic sources" to ascertain the meaning. *Cole,* 359 Md. at 305, 753 A.2d at 537. A policy term is considered "ambiguous if, to a reasonably prudent person, the term is susceptible to more than one meaning." *Id.* at 306, 753 A.2d at 537. The treatise, G.J. Couch, 2 *Couch Cyclopedia of*

*Insurance Law* (2d ed. 1959), on which the Maryland appellate courts have relied, states: "The criterion is ambiguity from the standpoint of a layman, not from that of a lawyer." *Id.*, § 15:84, at 416–418.

"'Maryland does not follow the rule that insurance policies should, as a matter of course, be construed against the insurer.'" *Megonnell*, 368 Md. at 655, 796 A.2d at 771 (citation omitted); *see Bushey v. Nothern Assurance Co. of America*, 362 Md. 626, 632, 766 A.2d 598, 601 (2001); *Collier v. MD-Individual Practice Ass'n*, 327 Md. 1, 5, 607 A.2d 537, 539 (1992). But, "if ambiguity is determined to remain after consideration of extrinsic evidence, 'it will ordinarily be resolved against the party who drafted the contract,' where no material evidentiary factual dispute exists." *Clendenin Bros., Inc. v. U.S. Fire Ins. Co.*, 390 Md. 449, 459-60, 889 A.2d 387, 394 (2006); *see Callaway*, 375 Md. at 280, 825 A.2d 995, 1005-06 ("[W]hen a term in an insurance policy is found to be ambiguous, the court will construe that term against the drafter of the contract which is usually the insurer.").

A recent case in this district, *FINRA v. Axis*, 2013 WL 2946950, presented issues similar to those in the case at bar and provides guidance. The court in *FINRA v. Axis* interpreted an employment liability insurance policy issued to FINRA by Axis. The key question was whether an email sent to FINRA by counsel for a FINRA employee constituted a "claim" within the meaning of the policy. The policy defined "claim" as "the receipt by any Insured of . . . a written demand against any Insured for monetary or non-monetary relief[.]" *Id.* at *1. The email in question, which referred to a prior, oral conversation, stated, *id.*:

> Not to quibble, but just so that we are clear, I did not ask for 5 years of "severance pay." I said that Mr. Reich believed that FINRA's decision to terminate his employment was discriminatory, in that his age was a motivating factor. I added that Mr. Reich would settle that claim for a sum equal to 5 years' pay. You said that you could get him 12 months, but no more than that and that if

Mr. Reich chose not to accept that, his last day would be March 31. Mr. Reich rejects your counter-offer.

Judge Grimm held that the definition of "claim" was unambiguous and that the email constituted a claim as a matter of law. In particular, he stated, *id.* at *4 (quotation marks and citations omitted):

> A reasonably prudent person could not read the Policies and conclude that "claim" did not encompass written correspondence stating an amount for which an individual would settle a claim or, more specifically, that the February 3, 2011 email was anything other than a claim. To begin with, courts have found that the term 'claim' as used in liability insurance policies is unambiguous. Moreover, the Fourth Circuit stated that there was "no ambiguity" in an insurance policy that defined "claim" as "a written demand for monetary or non-monetary relief." Therefore, the meaning of "claim" as it pertains to the February 3, 2011 email is unambiguous and is an issue of law for this Court to resolve.

I also draw guidance from *SNL Fin., LC v. Philadelphia Indem. Ins. Co.*, 455 F. App'x 363, 368 (4th Cir. 2011), in which the Fourth Circuit interpreted an employment liability insurance policy. The policy defined "claim" as "a written demand for monetary or non-monetary relief." *Id.* The court explained that there was "no ambiguity in this policy language" and proceeded to "apply the plain meaning of that language" in considering whether two letters sent by counsel for an employee of the insured constituted a "claim" under the policy. In the first letter, counsel for the employee "asked to meet with SNL representatives to discuss certain discriminatory conduct that occurred during the course of [the employee's] employment with [SNL], including [his] termination." *Id.* at 365 (internal quotation marks omitted). In a second letter, counsel for the employee wrote, *id.* at 365 n.4:

> On January 18, 2008, we wrote in an effort to resolve certain issues that exist with respect to the above-referenced matter. In that letter, a copy of which is attached, we expressed our belief that a meeting with the appropriate person designated by you might prove helpful. To that end, we once again invite you to have your personal representative contact us so that we can pursue a possible amicable resolution of the issues, at this time.

The court concluded that the letters did not constitute "claims" under the policy. It explained, *id.* at 368:

> In these letters written on [the employee's] behalf, counsel: 1) refers to "certain discriminatory conduct" that purportedly occurred during [the employee's] employment with SNL; 2) states a "desire" to meet with SNL's representatives to "discuss" the issues, with a "hope" of arriving at an "amicable resolution"; and 3) requests that a SNL representative contact [counsel] to arrange such a meeting. These statements do not include a "demand" for any relief, either monetary or non-monetary. Therefore, we conclude that neither letter . . . contained a "claim," as that term is defined in the policy.

The 2010-2011 Policy defines "claim" as a "demand received by an **Insured** for money or services . . . ." 2010-2011 Policy at 19 (defined term bolded in original). As in *FINRA v. Axis* and *Klein*, this language is unambiguous and its interpretation is a matter of law for the Court. Applying the lessons of *FINRA v. Axis* and *Klein*, I conclude that neither the June 2009 Email nor the June 2009 Letter constitutes a "claim" as that term is defined in the 2010-2011 Policy.

As for the June 2009 Email and the June 2009 Letter, neither communication included any demand for money or services. Both communications referred to an accounting discrepancy, and the letter described how Lloyd's arrived at its conclusion that the discrepancy existed and requested "details and supporting documentation" about any additional claims that may exist. June 2009 Letter, ECF 47-11 at 12. The letter also explained that NIIS had been unable to complete its audit because RJW had not provided it with certain information. *Id.* at 13 ("[W]e attempted a reconciliation of the aggregate advancements . . . [but] during the second day of our on-site review we were informed . . . that approximately half of the files could not be located."). However, neither communication demanded payment of a sum of money, threatened litigation, or otherwise signified that the discrepancy was anything more than an accounting matter. Accordingly, neither communication constitutes a "claim" under the 2010-2011 Policy.

In contrast, however, the January 2010 Letter undoubtedly constitutes a claim. The January 2010 Letter expressly accused RJW of errors and omissions and it made a demand for money. It stated: "As a result of errors and omissions by R.J. Wilson & Associates, a demand is hereby made for the $1,113,811.66 in Specific and Aggregate amounts paid . . . . Perhaps we can resolve this claim without the necessity of litigation which we are fully prepared to commence." A reasonably prudent person would conclude that the definition of "claim" in the 2010-2011 Policy included an explicit, written demand for a particular amount of money, accompanied by a threat of litigation.

Defendants do not contest that they received the January 2010 Letter and that it contained a demand for payment. Opp. at 11. However, they argue that the demand did not constitute a "claim" because "RJW and MBA reasonably believed the January 29, 2010 letter to be in error." *Id.* Defendants list several reasons why they believed they did not owe the money demanded in the January 2010 Letter, *id.* at 11–13, and they maintain that when the demand was made, "Ronald Wilson had every indication that this was simply an accounting matter, which would be reconciled by the accountants in the final accounting." *Id.* at 13. Defendants then conclude, without citation, *id.*: "These facts, at the very least, raise a dispute of fact as to whether a 'Claim' was made against RJW and MBA prior to the 2010-2011 policy period."

Under defendants' rationale, even a lawsuit would not constitute a demand if the claims in the suit lacked merit. That position makes no sense. Indeed, defendants fail to support their conclusion. They do not identify, and I have not found, any language in the 2010-2011 Policy suggesting that the actual or perceived merits of a demand have any impact on whether that demand constitutes a "claim." The language of the policy simply states, without qualification,

that a claim is "[a] demand received by an **Insured** for money or services . . . ." The January 2010 Letter clearly included a demand for money; thus, it constituted a claim under the policy.

Defendants also attempt to avoid summary judgment by claiming that there are disputes of material fact as to the question of when a "claim" was first made against defendants. Again, however, the only dispute of fact defendants identify is whether the demand in the January 2010 Letter was meritorious. This dispute of fact is not "material" because, as explained, the actual or perceived merits of the demand are irrelevant to the determination of whether the demand constitutes a "claim" under the policy. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (noting that material facts are "facts that might affect the outcome of the suit").

For the foregoing reasons, I conclude that the January 2010 Letter constituted a "claim" made against the defendants, as that term was used in the 2010-2011 Policy. And, because it is undisputed that coverage is only available under the 2010-2011 Policy for a claim that was first made against the insured between October 31, 2010 and October 31, 2011, I conclude that no coverage is available under the 2010-2011 Policy.[13]

---

[13] To be sure, the actual lawsuit would also constitute a "claim" under the policy, and the lawsuit was filed within the 2010-2011 policy period. However, the 2010-2011 Policy provides that "related claims" will be considered a single claim first made "during the policy period in which the earliest of the related claims" was first made. 2010-2011 Policy, Endt 4. And, it is undisputed that the Maryland Action is related to the earlier demand made in the January 2010 Letter. Thus, the operative date is the date of the January 2010 Letter.

Additionally, Md. Code (2011 Repl. Vol., 2013 Supp.) § 19-110 of the Insurance Article ("Ins."), which, as discussed *infra*, requires an insurer to show actual prejudice before disclaiming coverage on the grounds that the claim was untimely *reported to the insurer*, does not require an insurer to show prejudice before disclaiming coverage on the grounds that the claim was *made against the insured* prior to the inception of the policy. In other words, the actual prejudice requirement of Ins. § 19-110 applies only to the notice provisions of a policy.

The parties have also both moved for summary judgment on the question of whether the Maryland Action is covered under the 2009-2010 Policy, which provides coverage for claims made and reported between October 31, 2009 and October 31, 2010. *See* 2009-2010 Policy, ECF 47-19 at 2. In light of the foregoing discussion, it is clear that the "claim" was first made against defendants in January 2010, which is within the policy period of the 2009-2010 Policy. However, Navigators insists that no coverage is available under the 2009-2010 Policy, and it offers two separate reasons.

First, Navigators cites Section I.A.2 of the 2009-2010 Policy, which provides that coverage is only available if, "prior to the inception of this policy . . . no insured had a basis to believe that any [] act or omission . . . might reasonably be expected to be the basis of a claim." In other words, plaintiff maintains that the 2009-2010 Policy does not provide coverage for claims arising from acts occurring before the inception of the 2009-2010 Policy if there was a reasonable basis to believe that those acts would eventually form the basis of a claim within the coverage period. And, according to Navigators, even if the June 2009 communications did not constitute claims, the existence of the accounting dispute would have given "a reasonable person . . . a basis to believe" that the dispute "might result in a Claim." Memo at 19.

Defendants disagree. In their view, "the determination as to whether RJW and MBA should have expected that this simple accounting issue might form the basis of a claim is an issue of fact which must be decided by the trier of fact." Opp. at 15.

I agree with defendants. The question of whether a reasonable person would have believed that a claim would result from the accounting discrepancy "is a matter about which reasonable minds could differ, and it [is] therefore inappropriate for resolution by summary

judgment." *Baysinger v. Schmid Products Co.*, 307 Md. 361, 367–68, 514 A.2d 1, 4 (1986). Accordingly, I will not grant summary judgment to Navigators on this ground.

Navigators next argues that, even if the claim was *made* within the policy period of the 2009-2010 Policy, it is undisputed that defendants did not *report* the claim to Navigators within the policy period of the 2009-2010 Policy. Instead, defendants reported the claim to Navigators on or about July 25, 2011. *See* Ex. O to Park Dec (ECF 47-18) at 3. According to Navigators, defendants' failure to report the claim within the coverage period absolves Navigators of any coverage responsibility under the 2009-2010 Policy.

Defendants counter that, under Maryland law, an insurer must show prejudice before denying coverage on the ground that an insured failed to provide timely notice of a claim. And, they argue that Navigators has failed to show that it was prejudiced by the failure to receive notice within the policy period. Alternatively, defendants contend that the question of prejudice is one for the trier of fact. Navigators responds that, under the circumstances attendant here, Maryland law does not require an insurer to show prejudice and, in any event, Navigators was prejudiced from defendants' failure to report the claim.

The parties' dispute about whether a showing of prejudice is necessary turns on whether Md. Code (2011 Repl. Vol., 2013 Supp.) § 19-110 of the Insurance Article ("Ins.") applies to claims-made-and-reported policies such as the one in this case. Ins. § 19-110 provides:

> An insurer may disclaim coverage on a liability insurance policy on the ground that the insured . . . has breached the policy by failing to cooperate with the insurer or by not giving the insurer required notice only if the insurer establishes by a preponderance of the evidence that the lack of cooperation or notice has resulted in actual prejudice to the insurer.

In support of their positions, both sides point to the Maryland case of *Sherwood Brands, Inc. v. Great Am. Ins. Co.*, 418 Md. 300, 303, 13 A.3d 1268, 1270 (2011), although they offer

contrasting interpretations.  Defendants maintain that *Sherwood* squarely held that § 19-110 applies to claims-made-and-reported policies.  Plaintiff disagrees, arguing that *Sherwood* held only that § 19-110 applies to claims-made policies, but did not hold that § 19-110 also applies to claims-made-and-reported policies.  And, according to plaintiff, prior Maryland cases made clear that § 19-110 does not apply to claims-made-and-reported policies.

Since *Sherwood*, three judges in this district have addressed the applicability of § 19-110 to claims-made-and-reported policies, but they have reached differing conclusions.  Judge Bredar and Judge Grimm have both ruled that § 19-110 was inapplicable to the claims-made-and-reported policies in their respective cases.  *See FINRA v. Axis*, *supra*, 2013 WL 2946950 (Grimm, J.); *Minnesota Lawyers Mut. Ins. Co. v. Baylor & Jackson, PLLC*, 852 F. Supp. 2d 647 (D. Md. 2012) (Bredar, J.), *aff'd*, 531 F. App'x 312 (4th Cir. 2013).[14]  More recently, however, Judge Bennett determined that § 19-110 did apply to a claims-made-and-received policy.  *See McDowell Bldg., LLC v. Zurich Am. Ins. Co.*, 2013 WL 5234250 (D. Md. Sept. 17, 2013).

Upon review of *Sherwood* and the cases that have followed in its wake, I agree with Judge Bennett that § 19-110 applies to claims-made-and-reported policies.  Maryland law requires insurers to show prejudice in order to disclaim coverage for untimely notice.

In *Sherwood*, Great American Insurance Company ("Great American") issued a liability insurance policy to Sherwood Brands, Inc. ("Sherwood").  Section III of the policy defined

---

[14] In affirming Judge Bredar's opinion, the Fourth Circuit did not reach the question of whether Ins. § 19-110 applies to claims-made-and-reported policies.  Rather, it held that the insurer had shown prejudice and "affirm[ed] the district court's judgment on that basis, without determining the applicability of section 19–110 to [the] policy."  *Minnesota Lawyers Mut. Ins. Co. v. Baylor & Jackson, PLLC*, 531 F. App'x 312, 320 (4th Cir. 2013).  Judge Thacker filed a dissenting opinion in which she stated, *id.* at 323: "Contrary to the district court's reasoning, however, *Sherwood Brands* makes clear that [§ 19-110] applies in this case to require [the insurer to] establish actual prejudice before it can properly disclaim coverage."

"claim" as either "(1) a written demand for monetary or non-monetary relief" or "(2) a civil, criminal, administrative or arbitration proceeding made against any Insured seeking monetary or non-monetary relief." *Sherwood*, 418 Md. at 304–05, 13 A.3d at 1271. Section VIII of the policy, "Notice of Claim," provided, in pertinent part, *id.* at 305, 13 A.3d at 1271:

> A. The Insureds shall, as a condition precedent to their rights under this Policy, give the Insurer notice in writing of any Claim . . . .
>
>> (1) as defined in Section III.A.(1) which is made during the Policy Period. Such notice shall be given prior to the end of the Policy Period;
>>
>> (2) as defined in Section III.A.(2) [*supra*] which is made during the Policy Period. Such notice shall be given as soon as practicable, but in no event later than ninety (90) days after the end of the Policy Period.

Sherwood was sued within the policy period. However, it did not give notice to Great American until more than 90 days after the end of the policy period. *Id.* at 305–06, 13 A.3d at 1271–72. The trial court granted Great American's cross-motion for summary judgment, holding that it was not required by § 19-110 to show actual prejudice. The Maryland Court of Appeals reversed.

The *Sherwood* Court began its analysis by tracing the origins of Ins. § 19-110, which arose from legislative dissatisfaction with the Maryland Court of Appeals's decision in *Watson v. United States Fidelity and Guaranty Co.*, 231 Md. 266, 189 A.2d 625 (1963), *superseded by statute*, Ins. § 19-110. In *Watson*, the Maryland Court of Appeals held that an insurer was not required to show prejudice in order to deny coverage to an insured who failed to timely notify the insurer. *See Watson*, 231 Md. at 273, 189 A.2d at 628; *Prince George's County v. Local Gov't Ins. Trust*, 388 Md. 162, 181, 879 A.2d 81, 93 (2005) (discussing *Watson*). At the legislative session immediately following *Watson*, the General Assembly enacted what is now Ins. § 19-110. The *Sherwood* Court noted three potential reasons for the General Assembly's

swift reaction, *id.* at 312, 13 A.3d 1275 (quoting *A Legal Process Analysis for a Statutory and Contractual Construction of Notice and Proof of Loss Insurance Disclaimers*, 38 Md. L. Rev. 299, 309–10 (1978)):

> First, an aura of unfairness emanates from a situation in which an insurance company is permitted to disclaim liability when it is not prejudiced by the insured's breach of a condition precedent. In such a situation, the insurer receives an unjustifiable windfall. Second, the *Watson* rule allows an unreasonable forfeiture by permitting the insurer's assertion of a technical irregularity to deny protection for which the insured has paid. Finally, allowing an insurer to disclaim liability has the undesirable effect of leaving victims of automobile accidents uncompensated by their paid-for insurance coverage.

The *Sherwood* Court then outlined the development of the case law interpreting and applying Ins. § 19-110. Of particular note was *T.H.E. Ins. Co. v. P.T.P. Inc.*, 331 Md. 406, 422, 628 A.2d 223, 231 (1993),[15] in which an insurer denied coverage under a claims-made policy because the claim had not been asserted against the insured within the policy period. The *T.H.E.* Court held that Ins. § 19-110 did not apply in such a case. The court first noted that, by its terms, the version of Ins. § 19-110 then in effect applied only when the insurer sought to "disclaim coverage on any policy of liability insurance . . . on the ground that the insured . . . *has breached the policy* . . . by not giving requisite notice to the insurer." *Id.* at 416–417 (emphasis added).[16] The *T.H.E.* Court then reasoned that "there can be no breach of the policy where a claim is 'made' after the policy's expiration . . . as one cannot 'breach' a policy that is no longer in existence." *Sherwood*, 418 Md. at 319, 13 A.3d at 1279.

---

[15] The facts of *T.H.E.* are set forth at length in *Sherwood* and in Judge Bennett's opinion in *McDowell*. Accordingly, I will not repeat them here.

[16] The provision has been recodified and rephrased since *T.H.E.*, but the revisor's note to the 1996 codification states: "This section is new language derived without substantive change from former Art. 48A, § 482." *Sherwood*, 418 Md. at 322, 13 A.3d at 1282.

In *Sherwood*, the Maryland Court of Appeals "carefully circumscrib[ed] its holding in *T.H.E.*" *McDowell*, 2013 WL 5234250, at *7. Interpreting its own case (*T.H.E.*), the *Sherwood* Court stated that "*T.H.E.* does *not* stand for the proposition that the statute does not apply to a 'claims made plus reporting' policy," and it expressly disapproved of conclusions to the contrary reached by the Fourth Circuit and two Maryland federal district courts.[17] *Sherwood*, 418 Md. at 327 n.22, 13 A.2d at 1284 n.22 (emphasis in original, internal quotation marks omitted); *see id.* at 326 n.21, 13 A.2d at 1284 n.21 ("[W]e disavow ourselves of language in *Janjer*, *Maynard*, and *Rouse* suggesting that *T.H.E.* be read to stand for the proposition that § 19–110 does not apply to all 'claims-made-and-reporting policies.'"). The *Sherwood* Court explained, *id.* at 326–27, 13 A.2d at 1284 (internal citations omitted):

> *T.H.E.* is not dispositive of the issue before us. The Court in *T.H.E.* was careful to circumscribe its holding by stating that "[i]t would be an incorrect oversimplification to express the issue here to be whether [§ 19-110] applies at *all* to claims made policies." One reading of *T.H.E.*, then, is that it . . . said nothing about a situation in which claims are made against the insured *before* the expiration date of the policy (as in the present case).

Turning to the policy before it, the *Sherwood* Court reiterated that Ins. § 19-110 only applies when the insured breaches the insurance policy. The court then drew a distinction between a condition precedent and a covenant, noting that if the notice provision in the policy was a condition precedent to coverage, "then Sherwood does not 'breach the policy' by failing to obey the notice provisions" because the policy was never triggered. *Sherwood*, 418 Md. at 330, 13 A.3d at 1286 (citing Restatement (Second) of Contracts § 225 (1981)). However, "if the notice provisions are deemed covenants, Sherwood's failure to give Great American notice . . .

---

[17] The Maryland Court of Appeals disapproved of the following cases: *Janjer Enters., Inc. v. Executive Risk Indem., Inc.*, 97 F. App'x 410 (4th Cir. 2004); *Maynard v. Westport Ins. Corp.*, 208 F. Supp.2d 568 (D. Md. 2002), *aff'd*, 55 F. App'x 667 (4th Cir. 2003); and *Rouse Co. v. Fed. Ins. Co.*, 991 F. Supp. 460 (D. Md. 1998).

would constitute a 'breach of the policy,' such that § 19–110 would apply to require Great American to show that it was prejudiced by Sherwood's late-delivered notice." *Sherwood*, 418 Md. at 330, 13 A.3d at 1286.

The *Sherwood* Court concluded that the notice provisions were covenants. Critically, the court's holding was based not on the particular language of the policy before it, but rather on its conclusion that "§ 19–110 mandates that the notice provisions of the Policy be treated as covenants, not conditions." *Id.* at 331, 13 A.3d at 1286. Indeed, the insurance policy at issue in *Sherwood* expressly classified the notice provision as a condition precedent, but the court refused to treat it as such. According to the court, the very purpose of Ins. § 19-110 was to overrule *Watson*'s "strict condition-precedent approach," and therefore to make "policy provisions requiring notice to, and cooperation with, the insurer *covenants and not conditions.*" *Id.* (emphasis in original; internal quotations omitted). The court held, *id.* at 333, 13 A.3d at 1288:

> [W]e hold that § 19–110 does apply, as is the case at present, to claims-made policies in which the act triggering coverage occurs during the policy period, but the insured does not comply strictly with the policy's notice provisions. In the latter situation, § 19–110 mandates that notice provisions be treated as covenants, such that failure to abide by them constitutes a breach of the policy sufficient for the statute to require the disclaiming insurer to prove prejudice.

*See also id.* at 326 n.21, 13 A.3d 1284 n.21 ("Notice provisions, even in claims-made-and-reporting policies, must be deemed covenants such that failure to abide by them constitutes a breach of the policy sufficient to make § 19–110 applicable to such policies.").

In my view, *Sherwood*'s conclusion is crystal clear: Ins. § 19-110 applies to claims-made-and-reported policies, like the one at issue here, when the claim is made within the policy period but is not reported until after the policy period. In such a case, the insurer must show actual prejudice in order to avoid coverage.

Plaintiff's arguments to the contrary are unpersuasive. Plaintiff suggests that the policy at issue in *Sherwood* was a claims-made policy rather than a claims-made-and-reported policy, *see* Navigators Reply at 14, and cites several Fourth Circuit and Maryland district court cases for the proposition that Ins. § 19-110 does not apply to claims-made-and-reported policies. *See* Navigators Reply at 13 (citing, *e.g.*, *Janjer*, 97 F. App'x 410; *Maynard*, 55 F. App'x 667; *Rouse*, 991 F. Supp. 460). However, as noted, in *Sherwood* the Maryland high court, performing its duty to interpret Maryland law, expressly "disavow[ed] language in *Janjer*, *Maynard*, and *Rouse* suggesting that *T.H.E.* be read to stand for the proposition that § 19–110 does not apply to all 'claims-made-and-reporting policies.'" *Sherwood*, 418 Md. at 326 n.21, 13 A.3d at 1284 n.21.

Moreover, the policy in *Sherwood* had elements of both types of policies. It required an insured to give notice that it had been sued "as soon as practicable, but in no event later than ninety (90) days after the end of the Policy Period." *Id.* at 326, 13 A.3d at 1284. And, the *Sherwood* Court did not expressly categorize the policy, instead noting that it had elements of both a claims-made policy and a claims-made-and-reported policy. *See id.* ("It would be simple—if not lazy—for us to conclude that *T.H.E.* held that § 19-110 does not apply to claims-made policies, pronounce the Policy a claims-made policy, and move on to the next case. We decline to follow that path. . . . Further, it would be simple to focus on the portion of the Policy requiring Sherwood to give notice 'as soon as practicable, but in no event later than ninety (90) days after the end of the Policy Period,' declare the Policy a 'claims-made-and-reported' policy, and jump on the bandwagon of other jurisdictions that decline uniformly to extend notice-prejudice rules to claims-made-and-reported policies. But no, we shall take the path less traveled.").

In any event, even if the 2009-2010 Policy at issue here were a claims-made policy, the *Sherwood* Court made clear that its holding applied regardless of the precise nature of the policy. The court expressly ruled: "Notice provisions, *even in claims-made-and-reporting policies*, must be deemed covenants such that failure to abide by them constitutes a breach of the policy sufficient to make § 19–110 applicable to such policies." *Sherwood*, 418 Md. at 327 n.21, 13 A.3d at 1284 n.21 (emphasis added).[18]

Navigators also argues that defendants previously "represented to the Court that the current Maryland law is that prejudice is not required" on claims-made-and-reported policies, and therefore should not be permitted to take a different position in the context of the pending motions. In particular, plaintiff points to defendants' "Motion to Stay Proceedings" pending a decision by the Fourth Circuit in the *Minnesota Lawyers* case. ECF 30. In defendants' memorandum in support of that motion (ECF 30-1), they explained that "the Fourth Circuit's decision will be dispositive of the prejudice issue in this case."[19] According to plaintiff, the Fourth Circuit's affirmance of the district court's decision requires plaintiff to abide by the district court's decision that no showing of prejudice is required. However, as discussed, *supra*, the Fourth Circuit in *Minnesota Lawyers* expressly declined to take any position as to whether a showing of prejudice was required. *See Minnesota Lawyers*, 531 F. App'x at 320. Defendants'

---

[18] Plaintiff also relies on the portion of *FINRA v. Axis* that interpreted *Sherwood* as holding that § 19-110 does not apply to claims-made-and-reported policies. Upon review of that portion of the *FINRA v. Axis* opinion, I believe that the court's interpretation of *Sherwood* was erroneous, as it relied on a portion of the *Sherwood* opinion that merely—set forth the law as it had been applied *up to that point* by the Fourth Circuit and other courts across the country. Later in the opinion, the *Sherwood* Court expressly stated that it disagreed with the authorities it had described in the earlier passage. *See Sherwood*, 418 Md. at 326 n.21, 13 A.3d at 1284 n.21; *see also id.* at 333–34, 13 A.3d at 1288 ("Ultimately, we are guided only—to the exclusion of other states' notice-prejudice jurisprudence—by the text of, and the policies underlying, § 19–110.").

[19] The Fourth Circuit issued its opinion in *Minnesota Lawyers* before I ruled on the motion for stay. Accordingly, the motion was denied as moot. ECF 52.

expectation that the Fourth Circuit would address a crucial issue pertinent to this case does not bind defendants to a position the Fourth Circuit declined to take.

For the foregoing reasons, I conclude that Ins. § 19-110 applies to this case and requires Navigators to prove, by a preponderance of the evidence, that it suffered actual prejudice resulting from defendants' failure to notify it of the claim within the policy period.

Navigators argues that it has, in fact, suffered prejudice. In particular, Navigators contends that, if it had been timely notified, it could have helped avoid litigation by appointing "an accounting expert to reconcile the aggregate accommodation advances" or by assisting in settling the matter. Navigators Reply at 18. Further, Navigators argues that had it known of the dispute when it issued the 2010-2011 Policy, it "could have increased the premium" that it charged defendants "or decided to not renew" the policy. *Id.* In response, defendants argue that Navigators is unable to meet its burden because it "proffers only speculation and conjecture as to what it 'could have' done differently." Def. Reply at 11. In defendants' view, Navigators "points to no lost witnesses or missing documents," "offers no evidence of foregone settlement opportunities," and "offers no facts to show that hiring an accountant would have avoided litigation." *Id.*

As indicated, under Maryland law, the insurer bears the burden of proof to show prejudice, and must do so by a preponderance of the evidence. *See Prince George's Cnty. v. Local Gov't Ins. Trust,* 388 Md. 162, 879 A.2d 81, 97 (2005). "The requirement of 'actual prejudice' means that an insurer may not disclaim coverage on the basis of prejudice that is only possible, theoretical, conjectural, or hypothetical." *Gen. Acc. Ins. Co. v. Scott*, 107 Md. App. 603, 615, 669 A.2d 773, 779, *cert. denied*, 342 Md. 115, 673 A.2d 707 (1996); *see Elste v. ISG Sparrows Point, LLC*, 188 Md. App. 634, 651, 982 A.2d 938, 948 (2009); *Commercial Union*

*Ins. v. Porter Hayden Co.*, 116 Md. App. 605, 698 A.2d 1167, 1197 (1997); *see also Oliff–Michael v. Mutual Benefit Ins. Co.,* 262 F.Supp.2d 602, 604 (D. Md. 2003). Moreover, it is not enough for an insurer to "surmise harm that may have occurred by virtue of the passage of time; prejudice cannot be presumed from the length of the delay." *Scott*, 107 Md. App. At 615, 669 A.2d at 779; *accord Prince George's Cnty.*, 388 Md. at 190 n.13, 879 A.2d at 98 n.13.

Navigators has not pointed to any facts in the record to support its assertion that it was prejudiced by defendants' failure to provide timely notice. Although Navigators claims that it could have appointed an accounting expert to attempt to resolve the dispute prior to litigation, it offers no evidence that this accounting expert would have been able to reconcile the discrepancies in the records of defendants and Lloyd's. Similarly, although Navigators claims that it could have engaged in settlement negotiations with Lloyd's, it provides no evidence to suggest that those settlement negotiations would have been fruitful. Indeed, Navigators has been defending RJW and MBA in the Maryland Action for more than two years and has seemingly been unable (or unwilling) to negotiate a settlement. Navigators provides no evidence to explain why earlier notice would have allowed it to negotiate a settlement that has now eluded it for over two years.

Navigators' final suggestion—that it could have increased defendants' premiums had it known of the claim prior to issuing the 2010-2011 policy—is doubly flawed. First, the prejudice inquiry relates to whether the insurer was prejudiced in "investigating, settling, or defending" the untimely claim. *Sherwood Brands, Inc. v. Great Am. Ins. Co.*, 418 Md. at 331, 13 A.3d at 1287. It is not so broad as to encompass prejudice it may have suffered in relation to other policies or other aspects of its business. In any event, Navigators offers no affidavits, testimony, or other evidence to support its assertion that it *could* have increased defendants' premiums, and even

more to the point, Navigators offers no evidence that it *would* have done so. In short, Navigators' purported prejudice is wholly speculative and is entirely unsupported by the record.

In sum, I conclude that Navigators is required to show actual prejudice before denying coverage under the 2009-2010 Policy. And, at this juncture, Navigators has not proffered any evidence of prejudice. I also conclude that there remains a fact question over whether the dispute that gave rise to the Maryland Action "might reasonably [have been] expected to be the basis of a claim," such that Navigators would be permitted to deny coverage pursuant to Section I.A.2 of the 2009-2010 Policy. Accordingly, with respect to the 2009-2010 Policy, the cross-motions for summary judgment will be denied.

### Duty to Indemnify

Navigators also argues that it has no duty to indemnify defendants under either policy because "RJW is only covered . . . to the extent it is held *vicariously liable* for MBA's acts or omissions," but "the wrongful acts complained of were committed by and/or were the responsibility of RJW." Memo at 19 (emphasis added). According to Navigators, "[t]he Maryland Action concerns the failure of the Defendants to properly account on the monthly bordereaux for the aggregate accommodation advances [and] RJW is responsible for preparing and reviewing the monthly bordereaux before they are sent to the Lloyd's broker." Memo at 19. Therefore, the argument goes, any liability in the Maryland Action would arise only out of the acts and omissions of RJW, for which there is no coverage under either policy.[20]

---

[20] This discussion relates only to Navigators' duty to *indemnify* RJW and MBA for liability resulting from the Maryland Action. It does not address Navigators' duty to *defend* RJW and MBA in the Maryland Action, which the parties agree "is broader than the duty to indemnify." *Perdue Farms, Inc. v. Travelers Cas. And Sur. Co. Of Am.*, 448 F.3d 252, 257 (4th Cir. 2006); *see Sheets v. Brethren Mut. Ins. Co.*, 342 Md. 634, 643, 679 A.2d 540, 559–60 (1996) (noting that the duty to defend arises as long as the plaintiff in a tort case alleges an "action that

Defendants argue that coverage for RJW is *not* limited to its vicarious liability for MBA's acts, but rather is available for RJW's own acts and omissions. However, their argument contradicts the plain language of the Additional Insured Endorsement.

As discussed, judicial "interpretation of insurance contracts to determine the scope and limitations of the insurance coverage, like any other contract, begins with the language employed by the parties." *MAMSI Life & Health Ins. Co.*, *supra*, 375 Md. at 279, 825 A.2d at 1005. Generally, Maryland courts "analyze the plain language of [an insurance] contract according to the words and phrases in their ordinary and accepted meanings as defined by what a reasonably prudent lay person would understand them to mean." *Universal Underwriters Ins. Co.*, *supra*, 135 Md. App. at 137, 761 A.2d at 1005.

MBA is the named insured under the 2009-2010 Policy. RJW is not named in the 2009-2010 Policy. RJW is, however, named in Endorsement #2 to the 2009-2010 Policy, titled "Additional Insured Endorsement." It provides that RJW "shall be added as additional Insureds under this policy, but only as respects [its] liability for an Insured's acts or omissions." Defendants' argument is that the first clause in the quoted sentence makes RJW an "Insured," and then the second clause guarantees coverage for the acts or omissions of an "Insured," which—because of the first clause—includes RJW.

RJW's argument slices the bread far too thin. The first clause provides that RJW is an additional insured, but the second clause qualifies the first, making clear that RJW is covered *only* to the extent that it is held liable for the acts or omissions of an insured. The use of the

is potentially covered by the policy, no matter how attenuated, frivolous, or illogical that allegation may be."). As noted, *supra*, Navigators failed to provide substantive argument regarding the existence *vel non* of a duty to defend, and it continues to defend MBA and RJW in the Maryland Action.

conjunction "but only" makes this limitation crystal clear. If the Endorsement were intended to provide coverage for RJW's own acts or omissions, it would have omitted the qualification and simply named RJW as an additional insured. Accordingly, I conclude that RJW is insured under the 2009-2010 Policy only to the extent that it is held vicariously liable for the acts or omissions of MBA. Put differently, RJW is not insured under the 2009-2010 Policy for liability that arises from its own independent acts or omissions.

However, summary judgment for Navigators would be premature because it is possible that liability will attach either to MBA or to MBA and RJW for MBA's acts or omissions. The Maryland Action is ongoing, and so the basis of any finding of liability has yet to be determined. Moreover, the complaint in the Maryland Action clearly alleges wrongful acts and/or omissions by MBA in relation to the discrepancies in the monthly bordereaux. For example, it expressly alleges that "it was MBA's obligation to review claims submitted by the insureds to confirm that payment was issued only on properly covered claims." ECF 1-1 ¶ 20. Further, the complaint in the Maryland Action alleges that MBA breached several duties by failing to maintain and produce accurate records. *Id.* ¶¶ 36, 37, 54, 55. And, the complaint alleges that Erin Burnett, "acting in her capacity as an officer of MBA and/or [RJW] . . . was the individual who provided the bordereaux to [Lloyd's] on a monthly basis." *Id.* ¶ 29.

Navigators essentially asks this Court to rule that no liability in the Maryland Action will arise out of the acts and/or omissions of MBA, but that question must be decided in the first instance by the court in the Maryland Action. *Nautilus Ins. Co. v. BSA Ltd. P'ship*, 602 F. Supp. 2d 641, 657 (D. Md. 2009) ("Generally, the question of whether a company must indemnify turns on a comparison of the *ultimate findings of fact* concerning the alleged occurrence with the policy coverage." (emphasis added) (internal quotation marks omitted)). Thus, it would be

premature for this Court to declare that no coverage will be available. *Trice, Geary & Myers, LLC v. Camico Mut. Ins. Co.*, 459 F. App'x 266, 277 (4th Cir. 2011) ("[A] declaration as to CAMICO Insurance's duty of indemnification would be premature at this time; such a declaration should instead be made after the underlying actions are resolved."); *Brohawn v. Transamerica Ins. Co.*, 276 Md. 396, 406, 347 A.2d 842, 849 (1975) ("[W]here, as here, the question to be resolved in the declaratory judgment action will be decided in pending actions, it is inappropriate to grant a declaratory judgment.").

## CONCLUSION

For the foregoing reasons, coverage is not available under the 2010-2011 Policy. Accordingly, I will grant plaintiff's motion for summary judgment as it relates to the 2010-2011 Policy and will deny defendants' cross-motion for summary judgment as it relates to that policy. With regard to the 2009-2010 Policy, a factual dispute remains with regard to whether the existence of the accounting dispute would have given a reasonable person a basis to believe that the dispute might result in a claim, thereby permitting Navigators to deny coverage pursuant to Section I.A.2 of the policy. Moreover, Navigators may not deny coverage on the basis of receiving untimely notice unless it proves prejudice by a preponderance of the evidence. Accordingly, I will deny both motions for summary judgment with regard to the 2009-2010 Policy.

A separate Order follows, consistent with this Memorandum.


Date: February 21, 2014                    _____/s/_____
                                           Ellen Lipton Hollander
                                           United States District Judge